United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued May 17, 2000 Decided August 15, 2000 

 No. 99-1442

 United States Telecom Association, et al., 
 Petitioners

 v.

 Federal Communications Commission and 
 United States of America, 
 Respondents

 AirTouch Communications, Inc., et al., 
 Intervenors

 Consolidated with 
 99-1466, 99-1475, 99-1523

 On Petitions for Review of an Order of the 
 Federal Communications Commission

 Theodore B. Olson argued the cause for petitioners United 
States Telecom Association, et al. With him on the briefs 

were Eugene Scalia, John H. Harwood, II, Lynn R. Chary-
tan, Michael Altschul, Jerry Berman, James X. Dempsey, 
Lawrence E. Sarjeant, Linda L. Kent, John W. Hunter and 
Julie E. Rones.

 Gerard J. Waldron argued the cause for petitioners Elec-
tronic Privacy Information Center, et al. With him on the 
briefs were Kurt A. Wimmer, Carlos Perez-Albuerne, Law-
rence A. Friedman, Kathleen A. Burdette, David L. Sobel and 
Marc Rotenberg.

 Stewart A. Baker, Thomas M. Barba, Matthew L. Stennes, 
Mary McDermott, Brent H. Weingardt, Todd B. Lantor, 
Robert A. Long Jr., Kevin C. Newsom, Robert B. McKenna 
and Dan L. Poole were on the brief for intervenor Sprint 
Spectrum, et al.

 Philip L. Malet, William D. Wallace and William F. Adler 
were on the brief for intervenors Globalstar, et al.

 John E. Ingle, Deputy Associate General Counsel, Federal 
Communications Commission, argued the cause for respon-
dent Federal Communications Commission. With him on the 
brief were Christopher J. Wright, General Counsel, Laurence 
N. Bourne and Lisa S. Gelb, Counsel.

 James M. Carr, Counsel, entered an appearance.

 Scott R. McIntosh, Attorney, U.S. Department of Justice, 
argued the cause for respondent United States of America. 
With him on the brief were David W. Ogden, Acting Assistant 
Attorney General, and Douglas N. Letter, Attorney.

 Before: Ginsburg, Randolph and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Tatel.

 Tatel, Circuit Judge: The Communications Assistance for 
Law Enforcement Act of 1994 requires telecommunications 
carriers to ensure that their systems are technically capable 
of enabling law enforcement agencies operating with proper 
legal authority to intercept individual telephone calls and to 
obtain certain "call-identifying information." In this proceed-

ing, telecommunications industry associations and privacy 
rights organizations challenge those portions of the FCC's 
implementing Order that require carriers to make available to 
law enforcement agencies the location of antenna towers used 
in wireless telephone calls, signaling information from custom 
calling features (such as call forwarding and call waiting), 
telephone numbers dialed after calls are connected, and data 
pertaining to digital "packet-mode" communications. Accord-
ing to petitioners, the Commission exceeded its statutory 
authority, impermissibly expanded the types of call-
identifying information that carriers must make accessible to 
law enforcement agencies, and violated the statute's require-
ments that it protect communication privacy and minimize the 
cost of implementing the Order. With respect to the custom 
calling features and dialed digits, we agree, vacate the rele-
vant portions of the Order, and remand for further proceed-
ings. We deny the petitions for review with respect to 
antenna tower location information and packet-mode data.

 I

 The legal standard that law enforcement agencies 
("LEAs") must satisfy to obtain authorization for electronic 
surveillance of telecommunications depends on whether they 
seek to intercept telephone conversations or to secure a list of 
the telephone numbers of incoming and outgoing calls on a 
surveillance subject's line. In order to intercept telephone 
conversations, law enforcement agencies must obtain a war-
rant pursuant to Title III of the Omnibus Crime Control and 
Safe Streets Act of 1968. Before issuing a Title III wiretap 
warrant, a judge must find that: (1) "normal investigative 
procedures have been tried and have failed or reasonably 
appear to be unlikely to succeed if tried or to be too danger-
ous"; and (2) there is probable cause for believing "that an 
individual is committing, has committed, or is about to com-
mit" one of a list of specifically enumerated crimes, that the 
wiretap will intercept particular communications about the 
enumerated offense, and that the communications facilities to 
be tapped are either being used in the commission of the 
crime or are commonly used by the suspect. 18 U.S.C. 

s 2518(3). The Electronic Communications Privacy Act of 
1986 ("ECPA"), id. s 3121 et seq., establishes less demanding 
standards for capturing telephone numbers through the use 
of pen registers and trap and trace devices. Pen registers 
record telephone numbers of outgoing calls, see id. s 3127(3); 
trap and trace devices record telephone numbers from which 
incoming calls originate, much like common caller-ID sys-
tems, see id. s 3127(4). Although telephone numbers are not 
protected by the Fourth Amendment, see Smith v. Maryland, 
442 U.S. 735, 742-45 (1979), ECPA requires law enforcement 
agencies to obtain court orders to install and use these 
devices. Rather than the strict probable cause showing 
necessary for wiretaps, pen register orders require only 
certification from a law enforcement officer that "the informa-
tion likely to be obtained is relevant to an ongoing criminal 
investigation." 18 U.S.C. s 3122(b)(2).

 Wiretaps, pen registers and trap and trace devices worked 
well as long as calls were placed using what has come to be 
known as POTS or "plain old telephone service." With the 
development and proliferation of new telecommunications 
technologies, however, electronic surveillance has become in-
creasingly difficult. In congressional hearings, the FBI iden-
tified 183 "specific instances in which law enforcement agen-
cies were precluded due to technological impediments from 
fully implementing authorized electronic surveillance (wire-
taps, pen registers and trap and traces)." H.R. Rep. No. 
103-827, pt. 1, at 14-15 (1994). These impediments stemmed 
mainly from the limited capacity of cellular systems to accom-
modate large numbers of simultaneous intercepts as well as 
from the growing use of custom calling features such as call 
forwarding, call waiting, and speed dialing. See id. at 14.

 Finding that "new and emerging telecommunications tech-
nologies pose problems for law enforcement," id., Congress 
enacted the Communications Assistance for Law Enforce-
ment Act of 1994 "to preserve the government's ability, 
pursuant to court order or other lawful authorization, to 
intercept communications involving advanced technologies 
such as digital or wireless transmission modes, or features 
and services such as call forwarding, speed dialing and con-

ference calling, while protecting the privacy of communica-
tions and without impeding the introduction of new technolo-
gies, features, and services," id. at 9. Known as CALEA, the 
Act requires telecommunications carriers and equipment 
manufacturers to build into their networks technical capabili-
ties to assist law enforcement with authorized interception of 
communications and "call-identifying information." See 47 
U.S.C. s 1002. The Act defines "call-identifying information" 
as "dialing or signaling information that identifies the origin, 
direction, destination, or termination of each communication 
generated or received by a subscriber by means of any 
equipment, facility, or service of a telecommunications carri-
er." Id. s 1001(2). CALEA requires each carrier to

 ensure that its equipment, facilities, or services ... are 
 capable of
 
 (1) expeditiously isolating and enabling the govern-
 ment, pursuant to a court order or other lawful authori-
 zation, to intercept, to the exclusion of any other commu-
 nications, all wire and electronic communications carried 
 by the carrier within a service area to or from equip-
 ment, facilities, or services of a subscriber of such carrier 
 concurrently with their transmission to or from the sub-
 scriber's equipment, facility, or service, or at such later 
 time as may be acceptable to the government; [and]
 
 (2) expeditiously isolating and enabling the govern-
 ment, pursuant to a court order or other lawful authori-
 zation, to access call-identifying information that is rea-
 sonably available to the carrier....
 
Id. s 1002(a)(1)-(2). Carriers must also "facilitat[e] autho-
rized communications interceptions and access to call-
identifying information ... in a manner that protects ... the 
privacy and security of communications and call-identifying 
information not authorized to be intercepted." Id. 
s 1002(a)(4)(A). Because Congress intended CALEA to 
"preserve the status quo," the Act does not alter the existing 
legal framework for obtaining wiretap and pen register autho-
rization, "provid[ing] law enforcement no more and no less 
access to information than it had in the past." H.R. Rep. No. 
103-827, pt. 1, at 22. CALEA does not cover "information 

services" such as e-mail and internet access. 47 U.S.C. 
ss 1001(8)(C)(i), 1002(b)(2)(A).

 To ensure efficient and uniform implementation of the Act's 
surveillance assistance requirements without stifling techno-
logical innovation, CALEA permits the telecommunications 
industry, in consultation with law enforcement agencies, regu-
lators, and consumers, to develop its own technical standards 
for meeting the required surveillance capabilities. See id. 
s 1006. The Act "does not authorize any law enforcement 
agency or officer" to dictate the specific design of communica-
tions equipment, services, or features. Id. s 1002(b)(1). Al-
though carriers failing to meet CALEA's requirements may 
incur civil fines of up to $10,000 a day, see 18 U.S.C. 
s 2522(c), the Act establishes a safe harbor under which 
carriers that comply with the accepted industry standards will 
be deemed in compliance with the statute, see 47 U.S.C. 
s 1006(a)(2). But "if a Government agency or any other 
person believes that such requirements or standards are 
deficient, the agency or person may petition the Commission 
to establish, by rule, technical requirements or stan-
dards...." Id. s 1006(b). Such Commission rules must:

 (1) meet the assistance capability requirements of sec-
 tion 1002 of [the statute] by cost-effective methods;
 
 (2) protect the privacy and security of communications 
 not authorized to be intercepted;
 
 (3) minimize the cost of such compliance on residential 
 ratepayers;
 
 (4) serve the policy of the United States to encourage 
 the provision of new technologies and services to the 
 public; and
 
 (5) provide a reasonable time and conditions for com-
 pliance with and the transition to any new standard, 
 including defining the obligations of telecommunications 
 carriers under section 1002 of [the statute] during any 
 transition period. 
Id.

 Following two years of proceedings and extensive negotia-
tions with the FBI, the Telecommunications Industry Associ-

ation ("TIA"), an accredited standard-setting body, adopted 
technical standards pursuant to CALEA's safe harbor, pub-
lishing them as Interim Standard/Trial Use Standard J-STD-
025. Known as the "J-Standard," this document outlines the 
technical features, specifications, and protocols for carriers to 
make subscriber communications and call-identifying informa-
tion available to law enforcement agencies having appropriate 
legal authorization.

 Challenging the J-Standard as "deficient," id., the Center 
for Democracy and Technology petitioned the Commission for 
a rulemaking to remove two provisions it claimed not only 
violate CALEA's privacy protections but also impermissibly 
expand government surveillance capabilities beyond those 
authorized by the statute. One of the challenged J-Standard 
provisions requires carriers to make available to law enforce-
ment agencies the physical location of the nearest antenna 
tower through which a cellular telephone communicates at the 
beginning and end of a call. According to the Center, this 
requirement effectively converts ordinary mobile telephones 
into personal location-tracking devices, giving law enforce-
ment agencies access to far more information than they 
previously had. The Center also argued that cellular antenna 
location information is not "call-identifying information," as 
defined in both the statute and the J-Standard. The other 
challenged provision relates to what is known as "packet-
mode data," which we shall describe in detail later in this 
opinion. See Section III infra. At this point, suffice it to say 
that, according to the Center, the J-Standard's inclusion of 
packet-mode data enables law enforcement agencies to obtain 
call content with no more than a pen register order.

 Both the Justice Department and the FBI also petitioned 
the Commission to modify the J-Standard, arguing that it 
does not include all of CALEA's required assistance capabili-
ties. The Department provided a list, known as the "FBI 
punch list," of nine additional surveillance capabilities that 
law enforcement wanted the Commission to add. The punch 
list included telephone numbers of calls completed using 

calling cards as well as signaling information related to 
custom calling features such as call waiting and conference 
calling.

 After soliciting public comment on the petitions, see Public 
Notice, 13 F.C.C.R. 13786 (1998); Further Notice of Pro-
posed Rulemaking 13 F.C.C.R. 22632 (1998), the Commission 
resolved the challenges to the J-Standard in its Third Report 
& Order, see In the Matter of Communications Assistance 
for Law Enforcement Act, 14 F.C.C.R. 16794 (1999) ("Third 
Report & Order"). The Commission denied the Center's 
petition to delete cellular antenna location information and 
packet-mode data. The location of cellular antenna towers 
used at the beginning and end of wireless calls, the Commis-
sion ruled, falls within CALEA's definition of call-identifying 
information because it "identifies the 'origin' or 'destination' 
of a communication." Id. at 16815 p 44. With respect to 
packet-mode data, the Commission recognized the uncertain-
ty regarding the technical feasibility of separating call content 
(requiring a Title III wiretap warrant) from call-identifying 
information (requiring only a pen register order). See id. at 
16819-20 pp 55-56. Although inviting further study of the 
matter, the Commission declined to remove packet-mode data 
from the J-Standard, explaining that CALEA makes no 
distinction between packet-mode and other communications 
technologies. See id.

 The Commission granted the Justice Department/FBI peti-
tion in part, adding four of the nine punch list capabilities to 
the J-Standard, adding two more in part (neither is chal-
lenged here), and declining to add three others (also unchal-
lenged). See id. at 16852 p 138. The four additions are:

 (1) "Post-cut-through dialed digit extraction": This re-
 quires carriers to use tone-detection equipment to gener-
 ate a list of all digits dialed after a call has been 
 connected. Such digits include not only the telephone 
 numbers dialed after connecting to a dial-up long-
 distance carrier (e.g., 1-800-CALL-ATT), but also, for 
 example, credit card or bank account numbers dialed in 
 order to check balances or transact business using auto-
 mated telephone services, see id. at 16842-46 pp 112-23;
 
 (2) "Party hold/join/drop information": This includes 
 telephone numbers of all parties to a conference call as 
 well as signals indicating when parties are joined to the 
 call, put on hold, or disconnected, see id. at 16825-28 
 pp 68-75;
 
 (3) "Subject-initiated dialing and signaling informa-
 tion": This includes signals generated by activating fea-
 tures such as call forwarding and call waiting, see id. at 
 16828-30 pp 76-82; and
 
 (4) "In-band and out-of-band signaling": This includes 
 information about signals sent from the carrier's network 
 to a subject's telephone, such as message-waiting indica-
 tors, special dial tones, and busy signals, see id. at 16830-
 33 pp 83-89.
 
 Two industry associations--the United States Telecom As-
sociation and the Cellular Telecommunications Industry Asso-
ciation--joined by the Center for Democracy and Technology, 
filed a petition for review in this court, as did the Electronic 
Frontier Foundation, Electronic Privacy Information Center, 
and American Civil Liberties Union. All petitions were con-
solidated. The Telecommunications Industry Association, the 
standard-setting organization that developed and issued the 
J-Standard, joined by another trade group, the Personal 
Communications Industry Association, and two telecommuni-
cations carriers, Sprint PCS and U S West, intervened to 
challenge the Third Report & Order, focusing on dialed digit 
extraction, the most costly of the added punch list items. 
The FCC and the Justice Department filed separate briefs 
defending the Commission's action.

 The consolidated petitions for review challenge six capabili-
ties: antenna tower location information and packet-mode 
data, both of which were included in the J-Standard; and 
dialed digit extraction, party hold/join/drop, subject-initiated 
dialing and signaling, and in-band and out-of-band signaling, 
the four punch list capabilities added by the Commission. 
With respect to these challenged capabilities, petitioners con-
tend that the Commission: (1) exceeded its authority under 
CALEA because at least some of the information required to 

be made available to law enforcement is neither call content 
nor "call-identifying information that is reasonably available 
to the carrier," 47 U.S.C. s 1002(a)(2); (2) failed adequately 
to "protect the privacy and security of communications not 
authorized to be intercepted," as required by the statute, id. 
s 1006(b)(2); and (3) failed both to ensure that the capability 
requirements are implemented "by cost-effective methods," 
id. s 1006(b)(1), and to "minimize the cost of such compliance 
on residential ratepayers," id. s 1006(b)(3). In Section II, we 
take up the four challenged punch list capabilities and anten-
na tower location information. We consider packet-mode 
communications in Section III.

 II

 Whether CALEA requires carriers to make available an-
tenna tower location information and the four punch list 
capabilities turns on what the Act means by "call-identifying 
information." To repeat, section 102(2) of CALEA defines 
"call-identifying information" as "dialing or signaling informa-
tion that identifies the origin, direction, destination, or termi-
nation of each communication generated or received by a 
subscriber by means of any equipment, facility, or service of a 
telecommunications carrier." Id. s 1001(2). The Commis-
sion interprets this definition to require adoption of all chal-
lenged capabilities, each of which, it claims, makes available 
information identifying the "origin, direction, destination, or 
termination" of calls. Petitioners argue that the definition 
limits "call-identifying information" to telephone numbers. 
Because location information and the four punch list items 
require carriers to make available more than telephone num-
bers, petitioners contend that these capabilities exceed 
CALEA's requirements. They argue that there is no statuto-
ry basis for location information to have been included in the 
J-Standard or for the Commission to have mandated the 
punch list capabilities.

 To resolve this challenge to the Commission's interpreta-
tion of a statute it is charged with administering, we proceed 
according to Chevron U.S.A. Inc. v. Natural Resources De-

fense Council, Inc., 467 U.S. 837 (1984). We ask first "wheth-
er Congress has directly spoken to the precise question at 
issue." Id. at 842. If it has, "that is the end of the matter; 
for the court, as well as the agency, must give effect to the 
unambiguously expressed intent of Congress." Id. at 842-43. 
If we find the statute silent or ambiguous with respect to the 
precise question at issue, we proceed to the second step of 
Chevron analysis, asking "whether the agency's answer is 
based on a permissible construction of the statute." Id. at 
843. At this stage of Chevron analysis, we afford substantial 
deference to the agency's interpretation of statutory lan-
guage. See id. at 844.

 Beginning with Chevron step one, we think it clear that 
section 102(2) does not "unambiguously" answer "the precise 
question at issue": Is "call-identifying information" limited to 
telephone numbers? To begin with, had Congress intended 
to so limit "call-identifying information," it could have done so 
expressly by using the term "telephone number" as it did in 
both sections 103(a)(2) and 207(a)(1)(C) of CALEA. See 47 
U.S.C. s 1002(a)(2); 18 U.S.C. s 2703(c)(1)(C). "Where Con-
gress includes particular language in one section of a statute 
but omits it in another section of the same Act, it is generally 
presumed that Congress acts intentionally and purposely in 
the disparate inclusion or exclusion." Russello v. United 
States, 464 U.S. 16, 23 (1983) (internal quotation marks and 
alteration omitted); see also, e.g., District of Columbia Hosp. 
Ass'n v. District of Columbia, 2000 WL 946581, at *3 (D.C. 
Cir.). CALEA's definition of "call-identifying information," 
moreover, refers not just to "dialing ... information," but 
also to "signaling information," leading us to believe that 
Congress may well have intended the definition to cover 
something more than just the "dialing ... information" con-
veyed by telephone numbers. Finally, section 103(a)(2) of 
CALEA provides that when information is sought pursuant to 
a pen register or trap and trace order, "call-identifying 
information shall not include any information that may dis-
close the physical location of the subscriber (except to the 
extent that the location may be determined from the tele-
phone number)." 47 U.S.C. s 1002(a)(2). As the Commis-
sion observed, Congress would have had no need to add this 
limitation if "call-identifying information" referred only to 

telephone numbers. See Third Report & Order, 14 F.C.C.R. 
at 16815 p 44 n.95.

 In support of their argument that "call-identifying informa-
tion" unambiguously means only telephone numbers, petition-
ers call our attention to the House Judiciary Committee 
Report, which does seem to describe such information in 
terms of telephone numbers. See H.R. Rep. No. 103-827, pt. 
1, at 21. Apparently addressing post-cut-through dialed dig-
its, the Report even says that "other dialing tones that may 
be generated by the sender that are used to signal customer 
premises equipment of the recipient are not to be treated as 
call-identifying information." Id. Yet the Report also echos 
CALEA's inherent ambiguity, stating that call-identifying 
information is "typically the electronic pulses, audio tones, or 
signalling messages that identify the numbers dialed or other-
wise transmitted for the purpose of routing calls through the 
telecommunications carrier's network." Id. (emphasis add-
ed). Although another section of the Report describes 
CALEA as requiring carriers to make available "information 
identifying the originating and destination numbers of target-
ed communications, but not the physical location of targets," 
id. at 16, that passage, as the Commission points out, appears 
to deal with an earlier version of the statute--before the 
definition of "call-identifying information" was expanded by 
adding the terms "direction" and "termination."

 Petitioners next argue that limiting "call-identifying infor-
mation" to telephone numbers mirrors ECPA's definitions of 
"pen register" and "trap and trace device." Pen registers 
record "the numbers dialed or otherwise transmitted," 18 
U.S.C. s 3127(3) (emphasis added), and trap and trace de-
vices record "the originating number of ... an electronic 
communication," id. s 3127(4) (emphasis added). Petitioners 
contend that because CALEA's enforcement provisions are 
limited to intercept warrants and to pen register and trap and 
trace device orders, the statute's required capabilities must 
likewise be restricted to the call content intercepted in a 
wiretap and the dialed telephone numbers recorded by pen 
registers. "It would have made no sense," say petitioners, 
"for Congress to require carriers to provide a capability that 
the surveillance laws do not authorize the government to 
use." Final Brief of Petitioners USTA, CTIA, and CDT at 
16.

 This is an interesting argument, but hardly sufficient to 
resolve CALEA's ambiguity. CALEA neither cross-
references nor incorporates ECPA's definitions of pen regis-
ters and trap and trace devices. Moreover, the fact that 
CALEA's definition of "call-identifying information" differs 
from ECPA's description of the information obtainable by pen 
registers and trap and trace devices reinforces the statute's 
inherent ambiguity.

 Petitioners also rely on the J-Standard's explanation of the 
terms used in CALEA's definition of call-identifying informa-
tion, pointing out that the J-Standard limits these terms to 
telephone numbers:

 [D]estination is the number of the party to which a call is 
 being made (e.g., called party); direction is the number 
 to which a call is re-directed or the number from which it 
 came, either incoming or outgoing (e.g., redirected-to 
 party or redirected-from party); origin is the number of 
 the party initiating a call (e.g., calling party); and termi-
 nation is the number of the party ultimately receiving a 
 call (e.g., answering party). Interim Standard/Trial Use 
 Standard J-STD-025, at 5.
 
Because cell phone location information and the four chal-
lenged punch list capabilities call for more than telephone 
numbers, petitioners argue that they conflict with the 
J-Standard's interpretation of CALEA. Again, this is an 
interesting argument, but not relevant at Chevron step one, 
where our focus is on whether "the intent of Congress is 
clear." Chevron, 467 U.S. at 842 (emphasis added). On that 
issue, the authors of the J-Standard can provide no guidance.

 Finally, petitioners point out that in Smith v. Maryland the 
Supreme Court held that although the Fourth Amendment 
protects the privacy of information conveyed during telephone 
calls, i.e., the contents of conversations, callers have no rea-
sonable expectation of privacy in dialed telephone numbers. 
See 422 U.S. at 742-45. Reading Smith's exception narrowly, 
petitioners argue that other than call content interceptable 
under a wiretap order, CALEA cannot require carriers to 
provide law enforcement agencies anything more than the 
telephone numbers dialed in order to complete calls. But 
petitioners point to nothing in either CALEA or its legislative 

history to suggest that Congress meant to follow Smith's 
protected-unprotected distinction in defining call-identifying 
information. Moreover, Smith's reason for finding no legiti-
mate expectation of privacy in dialed telephone numbers--
that callers voluntarily convey this information to the phone 
company in order to complete calls--applies as well to much 
of the information provided by the challenged capabilities. 
See id. at 742.

 Turning to the government's position, we understand nei-
ther the Commission nor the Justice Department to be argu-
ing that section 102(2) unambiguously includes more than 
telephone numbers in the definition of "call-identifying infor-
mation," and for good reason. Although we reject petition-
ers' argument that section 102(2) is unambiguously limited to 
telephone numbers, we think it equally clear that nothing 
points to an "unambiguously expressed intent of Congress" to 
require every one of the challenged assistance capabilities. 
Chevron, 467 U.S. at 843. Instead, the two agencies urge us 
to defer to the Commission's interpretation of the statute 
pursuant to Chevron's second step. See id. at 844. Accord-
ing to the agencies, the Commission reasonably interpreted 
"call-identifying information" to include the punch list capabil-
ities and antenna tower location information. Because we 
reach different conclusions with respect to the punch list and 
location information, we discuss them separately.

 Punch List

 Responding to the government's Chevron-two argument, 
petitioners contend: (1) the Commission's interpretation of 
"call-identifying information" to include the four added punch 
list capabilities is unreasonable and thus unworthy of 
Chevron-two deference; and (2) the Commission's decision to 
modify the J-Standard to include the punch list reflects a lack 
of reasoned decisionmaking, see generally, Motor Vehicle 
Mfrs Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 
(1983). Because we agree with the latter argument, we need 
not address the Commission's plea for Chevron deference.

 It is well-established that " 'an agency must cogently ex-
plain why it has exercised its discretion in a given manner' 
and that explanation must be 'sufficient to enable us to 
conclude that the [agency's action] was the product of rea-
soned decisionmaking.' " A.L. Pharma, Inc. v. Shalala, 62 
F.3d 1484, 1491 (D.C. Cir. 1995) (internal citation omitted) 
(quoting Motor Vehicle Mfrs., 463 U.S. at 48, 52). The 
Commission's determination that CALEA requires carriers to 
implement the four punch list items fails this test. The 
Commission asserted that each of the challenged punch list 
capabilities is required by CALEA because each requires 
carriers to make available "call-identifying information," but 
it never explained--not in the Order and not in its brief--the 
basis for this conclusion. Nowhere in the record did the 
Commission explain how the key statutory terms--origin, 
direction, destination, and termination--can cover the wide 
variety of information required by the punch list. For exam-
ple, the Commission uses "origin" of a communication to 
mean not only the telephone number of an incoming call, but 
also a tone indicating that a new call is waiting. Adding the 
waiting call to create a three-way call is yet another origin. 
If a party is placed on hold and then re-joined to the call, the 
Commission describes that event as "the temporary origin 
... of a communication." Third Report & Order, 14 F.C.C.R. 
at 16827 p 74. The Commission similarly uses "termination" 
to cover many different kinds of information including tele-
phone numbers of outgoing calls, signals indicating that calls 
have been placed on hold or switched to waiting calls, signals 
that parties have been dropped from conference calls, busy 
signals, and ringing tones. Yet the Commission never ex-
plained how each of these bits of information "identifies the 
... termination of each communication." 47 U.S.C. 
s 1001(2) (emphasis added). Instead, it simply concluded, 
with neither analysis nor explanation, that each capability is 
required by CALEA. See, e.g., Third Report & Order, 14 
F.C.C.R. at 16827 p 74 ("Party join information appears to 
identify the origin of a communication; party drop, the 
termination of a communication; and party hold, the tempo-

rary origin, temporary termination, or re-direction of a com-
munication." (emphasis added)).

 Perhaps the Commission can satisfactorily explain how 
CALEA's terms can encompass such a wide range of informa-
tion. Because it has not, we cannot tell whether the punch 
list capability requirements are "the product of reasoned 
decisionmaking." Motor Vehicle Mfrs., 463 U.S. at 52.

 The Commission's failure to explain its reasoning is particu-
larly serious in view of CALEA's unique structure. Rather 
than simply delegating power to implement the Act to the 
Commission, Congress gave the telecommunications industry 
the first crack at developing standards, authorizing the Com-
mission to alter those standards only if it found them "defi-
cient." 47 U.S.C. s 1006(b). Although the Commission used 
its rulemaking power to alter the J-Standard, it identified no 
deficiencies in the Standard's definitions of the terms "ori-
gin," "destination," "direction," and "termination," which de-
scribe "call-identifying information" in terms of telephone 
numbers. Were we to allow the Commission to modify the 
J-Standard without first identifying its deficiencies, we would 
weaken the major role Congress obviously expected industry 
to play in formulating CALEA standards.

 The Commission's decision to include the four challenged 
punch list capabilities suffers from two additional defects. 
The first relates to CALEA's requirements that Commission 
rules must "meet the assistance capability requirements of 
section 1002 of this title by cost-effective methods" and 
"minimize the cost of such compliance on residential ratepay-
ers." Id. s 1006(b)(1), (3). Faced with multiple cost esti-
mates ranging as high as $4 billion for all carriers to imple-
ment the core J-Standard capabilities, the Commission 
adopted an estimate submitted by five software suppliers 
predicting that they would earn $916 million in revenues for 
implementing the core J-Standard and $414 million for imple-
menting the punch list. Third Report & Order, 14 F.C.C.R. 
at 16805 p 20, 16809 p 30. The Commission acknowledged 
that "these estimates ... do not represent all carrier costs of 
implementing CALEA," id. at 16809 p 30, yet it found them to 

be "a reasonable guide of the costs to wireline, cellular, and 
broadband PCS carriers for CALEA compliance," id.

 The Commission never explained how its Order would 
satisfy CALEA's requirements "by cost-effective methods." 
47 U.S.C. s 1006(b)(1). It made no attempt to compare the 
cost of implementing the punch list capabilities with the cost 
of obtaining the same information through alternative means, 
nor did it explain how it measured cost-effectiveness. Al-
though it mentioned residential ratepayers, it never explained 
what impact its Order would have on residential telephone 
rates. Instead, pointing out that the telecommunications 
industry, by ratifying the J-Standard, had agreed to its 
implementation cost, the Commission compared the additional 
cost of each punch list capability with the total cost of the 
J-Standard and then concluded that each additional cost was 
"not so exorbitant as to require automatic exclusion of the 
capability." Third Report & Order, 14 F.C.C.R. at 16824 
p 66, 16828 p 75, 16829-30 p 82, 16832 p 89. But why? The 
Commission failed to explain how it decided that implement-
ing the punch list capabilities, which increase J-Standard 
costs by more than 45 percent (even by the Commission's 
conservative estimates) is "not so exorbitant." Suppose 
punch list costs had exceeded J-Standard costs by 90 percent. 
Would that have been too "exorbitant"? Asked this question 
at oral argument, Commission counsel told us only, "I sup-
pose it is a line-drawing exercise."

 The Commission's response to CALEA's cost directives 
reflects a classic case of arbitrary and capricious agency 
action. Fundamental principles of administrative law require 
that agency action be "based on a consideration of the rele-
vant factors," Citizens to Preserve Overton Park, Inc. v. 
Volpe, 401 U.S. 402, 416 (1971), and rest on reasoned decision-
making in which "the agency must examine the relevant data 
and articulate a satisfactory explanation for its action includ-
ing a rational connection between the facts found and the 
choice made," Motor Vehicle Mfrs., 463 U.S. at 43 (internal 
quotation marks omitted). Of course, we do not require 
"ideal clarity"; we will "uphold a decision ... if the agency's 
path may reasonably be discerned." Bowman Transp., Inc. 

v. Arkansas-Best Freight System Inc., 419 U.S. 281, 286 
(1974). On the record before us, however, we cannot "dis-
cern" how the Commission interpreted "cost-effective," nor 
why it considered the substantial costs of the punch list 
capabilities to be "not so exorbitant," nor finally what impact 
it thought the Order would have on residential ratepayers. 
Missing, in other words, is "a rational connection between the 
facts found and the choice made." Motor Vehicle Mfrs., 463 
U.S. at 43.

 The second defect in the Order relates to the Commission's 
failure to comply with CALEA's requirement that it "protect 
the privacy and security of communications not authorized to 
be intercepted," 47 U.S.C. s 1006(b)(2), with respect to post-
cut-through dialed digit extraction. This punch list capability 
requires carriers to electronically monitor the communica-
tions channel that carries audible call content in order to 
decode all digits dialed after calls are connected or "cut 
through." Some post-cut-through dialed digits are telephone 
numbers, such as when a subject places a calling card, credit 
card, or collect call by first dialing a long-distance carrier 
access number and then, after the initial call is "cut through," 
dialing the telephone number of the destination party. Post-
cut-through dialed digits can also represent call content. For 
example, subjects calling automated banking services enter 
account numbers. When calling voicemail systems, they en-
ter passwords. When calling pagers, they dial digits that 
convey actual messages. And when calling pharmacies to 
renew prescriptions, they enter prescription numbers.

 The government contends that a law enforcement agency 
may receive all post-cut-through digits with a pen register 
order, subject to CALEA's requirement that the agency uses 
"technology reasonably available to it" to avoid processing 
digits that are content. 18 U.S.C. s 3121(c). No court has 
yet considered that contention, however, and it may be that a 
Title III warrant is required to receive all post-cut-through 
digits. The Commission therefore had a statutory obligation 
to address how its Order, which requires the capability to 
provide all dialed digits pursuant to a pen register order, 
would "protect the privacy and security of communications 
not authorized to be intercepted." 47 U.S.C. s 1006(b)(2). 

The Commission spoke of law enforcement's need to obtain 
post-cut-through dialed digits and of the cost of providing 
them, but it never explained, as CALEA requires, how its 
rule will "protect the privacy and security of communications 
not authorized to be intercepted."

 Several commenters, moreover, suggested ways in which 
law enforcement agencies having only pen register orders 
could obtain post-cut-through phone numbers while protect-
ing the privacy of call content. The Commission rejected 
these alternatives, claiming not that they are technologically 
infeasible, but that they "would shift the cost burden from the 
originating carrier to the LEA," "could be time-consuming," 
and might burden law enforcement's ability "to conduct elec-
tronic surveillance effectively and efficiently." Third Report 
& Order, 14 F.C.C.R. at 16845 p 121. This is an entirely 
unsatisfactory response to CALEA's privacy provisions. The 
statute requires the Commission to consider more than the 
burden on law enforcement--after all, any privacy protections 
burden law enforcement to some extent. The Commission's 
rules must not only meet CALEA's "assistance capability 
requirements," 47 U.S.C. s 1006(b)(1), but also "protect the 
privacy and security of communications not authorized to be 
intercepted," id. s 1006(b)(2).

 The absence of any meaningful consideration of privacy 
with respect to dialed digit extraction does not seem to stem 
from a failure on the Commission's part to understand the 
privacy consequences of its Order. To the contrary, recogniz-
ing that there is no way to distinguish between digits dialed 
to route calls and those dialed to communicate information, 
the Commission expressed "concern[ ] about ... the privacy 
implications of permitting LEAs to access non-call-identifying 
digits (such as bank account numbers) with only a pen 
register warrant." Third Report & Order, 14 F.C.C.R. at 
16846 p 123. Yet the Order requires carriers to make avail-
able all post-cut-through dialed digits--those that convey 
content as well as telephone numbers.

 Asked at oral argument to point out how the Commission 
applied CALEA's privacy mandate to post-cut-through dialed 

digits, Commission counsel stated, "we addressed ourselves to 
the privacy questions with a little bit of hand wringing and 
worrying...." Transcript of Oral Argument at 29. Neither 
hand wringing nor worrying can substitute for reasoned 
decisionmaking.

 For the foregoing reasons, we vacate the portions of the 
Commission's Order dealing with the four challenged punch 
list capabilities and remand for further proceedings consistent 
with this opinion.

 Location Information

 We reach a different conclusion with respect to the Com-
mission's refusal to remove the antenna tower location infor-
mation capability from the J-Standard. This provision re-
quires carriers to make available the physical location of the 
antenna tower that a mobile phone uses to connect at the 
beginning and end of a call. Unlike the Commission's adop-
tion of the punch list, its decision with regard to location 
information is both reasoned and reasonable.

 To begin with, as the Commission observed in the Third 
Report & Order, defining "call-identifying information" to 
include antenna tower location finds support in 
CALEA's text. In particular, section 103(a)(2) provides that 
"with regard to information acquired solely pursuant to the 
authority for pen registers and trap and trace devices ... 
call-identifying information shall not include any information 
that may disclose the physical location of the subscriber 
(except to the extent that the location may be determined 
from the telephone number)." 47 U.S.C. s 1002(a)(2). As we 
note above, the Commission read this provision to imply that 
location information falls within the definition of call-
identifying information. Section 103(a)(2), the Commission 
ruled, "simply imposes upon law enforcement an authorization 
requirement different from that minimally necessary for use 
of pen registers and trap and trace devices." Third Report & 
Order, 14 F.C.C.R. at 16815 p 44. Disagreeing, petitioners 
argue that section 103(a)(2) narrows the definition of call-
identifying information and should not be read as an affirma-
tive grant of authority for law enforcement agencies to obtain 

location information. As the Commission explained, however, 
if "call-identifying information" did not include location infor-
mation, this provision would have no function. See id. at 
16815 p 44 & n.95. In reaching this conclusion, the Commis-
sion was simply following the well-accepted principle of statu-
tory construction that requires every provision of a statute to 
be given effect. See Washington Market Co. v. Hoffman, 101 
U.S. 112, 115-16 (1879) ("We are not at liberty to construe 
any statute so as to deny effect to any part of its language.").

 The Commission's approach to location information also 
finds support in CALEA's use of the word "signaling" in the 
definition of "call-identifying information." As the agency 
explains in its brief, a mobile phone "sends signals to the 
nearest cell site at the start and end of a call. These signals, 
which are necessary to achieve communications between the 
caller and the party he or she is calling, clearly are 'signaling 
information.' Information about the cell sites associated with 
mobile calls therefore falls squarely within the statutory 
definition of call-identifying information." Brief for Federal 
Communications Commission at 38.

 Not only did the Commission elucidate the textual basis for 
interpreting "call-identifying information" to include location 
information, but it also explained how that result comports 
with CALEA's goal of preserving the same surveillance capa-
bilities that law enforcement agencies had in POTS (plain old 
telephone service). "[I]n the wireline environment," the 
Commission explained, law enforcement agencies "have gen-
erally been able to obtain location information routinely from 
the telephone number because the telephone number usually 
corresponds with location." Third Report & Order, 14 
F.C.C.R. at 16816 p 45. In the wireless environment, "the 
equivalent location information" is "the location of the cell 
sites to which the mobile terminal or handset is connected at 
the beginning and at the termination of the call." Id. Ac-
cordingly, the Commission concluded, "[p]rovision of this 
particular location information does not appear to expand or 
diminish law enforcement's surveillance authority under prior 
law applicable to the wireline environment." Id.

 The Commission's refusal to remove location information 
from the J-Standard, moreover, does not share the other 
problems that led us to vacate the punch list portion of the 
Third Report & Order. As to cost, location information was 
included in the J-Standard adopted by industry, so it is 
unaffected by the deficiencies in the Commission's cost analy-
sis. And in contrast to dialed digit extraction, the Commis-
sion's analysis of the location capability did more than just 
pay lip service to CALEA's privacy requirements. Most 
important, the Commission demonstrated its understanding 
that antenna location information could only be obtained with 
something more than a pen register order, see id. at 16815 
p 44, a point the Justice Department concedes in its brief: "A 
pen register order does not by itself provide law enforcement 
with authority to obtain location information, and we have 
never contended otherwise." Final Brief for the United 
States at 19. Expressly relying on CALEA's privacy protec-
tion provisions, moreover, the Commission rejected a New 
York Police Department proposal that would have required 
triangulating signals from multiple cellular antenna towers to 
pinpoint a wireless phone's precise location throughout a call's 
duration. See Third Report & Order, 14 F.C.C.R. at 16816 
p 46. "[S]uch a capability," the Commission found, "poses 
difficulties that could undermine individual privacy." Id.

 For these reasons, we deny the petitions for review with 
respect to location information.

 III

 This brings us to petitioners' challenge to the Commission's 
decision not to remove the packet-mode data requirement 
from the J-Standard. In conventional circuit-mode telecom-
munications, a single circuit is opened between caller and 
recipient and all electronic signals that make up the communi-
cation travel along the circuit. In digital packet-switched 
networks, communications do not travel along a single path. 
Instead, a call is broken into a number of discrete digital data 
packets, each traveling independently through the network 
along different routes. Data packets are then reassembled in 
the proper sequence at the call's destination. Like an envel-

ope, each digital packet has two components: it contains a 
portion of the communication message, and it bears an ad-
dress to ensure that it finds its way to the correct destination 
and is reassembled in proper sequence. The address infor-
mation appears in the packet's "header." The message with-
in the packet is known as the "body" or "payload." The 
J-Standard requires that carriers make available both header 
and payload.

 Telecommunication carrier petitioners claim that packet 
headers (call-identifying information) cannot be separated 
from packet bodies or payloads (call content). Accordingly, 
they and the privacy petitioners argue that any packet-mode 
data provided to a law enforcement agency pursuant to a pen 
register order will inevitably include some call content, thus 
violating CALEA's privacy protections. The FBI disagrees. 
"[A]s a technical matter," it argued before the Commission, 
"it is perfectly feasible for a LEA to employ equipment that 
distinguishes between a packet's header and its communica-
tions payload and makes only the relevant header information 
available for recording or decoding." Third Report & Order, 
14 F.C.C.R. at 16818 p 54.

 The Commission considered these conflicting views about 
the feasibility of separating call content from packet header 
data, concluding that "the record is not sufficiently developed 
to support any particular technical requirements for packet-
mode communications." Id. at 16817 p 48. At the same time, 
the Commission acknowledged that "privacy concerns could 
be implicated if carriers were to give to LEAs packets 
containing both call-identifying and call content information 
when only the former was authorized." Id. Stating that 
"further efforts can be made to find ways to better protect 
privacy by providing law enforcement only with the informa-
tion to which it is lawfully entitled," the Commission asked 
the Telecommunications Industry Association, which devel-
oped the J-Standard, "to study CALEA solutions for packet-
mode technology and report to the Commission in one year 
on steps that can be taken, including particular amendments 
to [the J-Standard], that will better address privacy con-
cerns." Id. at 16819 p 55. In the meantime, however, finding 
the record insufficient to warrant modification of the 

J-Standard's packet-mode data provision, the Commission 
directed that it be implemented "no later than September 30, 
2001." Id. "That date," the Commission explained, "is 15 
months after the June 30, 2000 CALEA compliance deadline, 
and will afford manufacturers that have not yet developed a 
packet-mode capability the time needed to do so." Id. At 
the same time, the Commission emphasized that it viewed this 
as an interim solution. "We recognize that, in view of the 
growing importance of packet-mode communications, a timely 
permanent solution is essential. Accordingly, we expect that 
TIA will deliver a report to us no later than September 30, 
2000 that will detail a permanent solution...." Id. at 16820 
p 56.

 The Commission's denial of the petitions to remove packet-
mode data from the J-Standard suffers from none of the 
shortcomings that undermined its handling of the punch list 
capabilities. First, because nobody questions that packet 
header information contains "call-identifying information," the 
ambiguity of that term's definition does not affect the packet-
mode requirement. Second, as with location information, but 
unlike the four punch list capabilities, because the packet-
mode requirement was included in the J-Standard adopted 
by industry it is unaffected by the deficiencies in the Commis-
sion's cost analysis. Third, unlike the case of dialed digit 
extraction, the Commission thoroughly considered the privacy 
implications of packet-mode data and invited further study to 
"better address privacy concerns." Id. at 16819 p 55.

 Finally, nothing in the Commission's treatment of packet-
mode data requires carriers to turn over call content to law 
enforcement agencies absent lawful authorization. Although 
the Commission appears to have interpreted the J-Standard 
as expanding the authority of law enforcement agencies to 
obtain the contents of communications, see id., the Commis-
sion was simply mistaken. All of CALEA's required capabili-
ties are expressly premised on the condition that any infor-
mation will be obtained "pursuant to a court order or other 
lawful authorization." 47 U.S.C. s 1002(a)(1)-(3). CALEA 
authorizes neither the Commission nor the telecommunica-
tions industry to modify either the evidentiary standards or 

procedural safeguards for securing legal authorization to ob-
tain packets from which call content has not been stripped, 
nor may the Commission require carriers to provide the 
government with information that is "not authorized to be 
intercepted." Id. See also Final Brief for the United States 
at 4 ("If the government lacks the requisite legal authority to 
obtain particular information, nothing in Section 103 obligates 
a carrier to provide such information."). Petitioners thus 
have no reason to fear that "compliance with the Order will 
force carriers to violate their duty under CALEA to 'protect 
the privacy and security of communications ... not autho-
rized to be intercepted.' " Final Brief of Petitioners USTA, 
CTIA, and CDT at 35. We therefore deny the petition for 
review with respect to packet-mode data.

 IV

 We grant the petitions for review in part, vacate the 
provisions of the Third Report & Order dealing with the four 
challenged punch list capabilities, and remand to the Commis-
sion for further proceedings consistent with this opinion. In 
all other respects, we deny the petitions for review.

 So ordered.